**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **SAMI FRANCIS KHOURY,** | § | |
| | § | |
| ***Petitioner*,** | § | |
| **v.** | § | |
| | § | |
| **ANGEL GARITE,** *Assistant Field Office* | § | |
| *Director, El Paso Field Office, El Paso* | § | |
| *Service Processing Center*; | § | **EP-25-CV-00577-DCG** |
| **JOEL GARCIA,** *Field Office Director,* | § | |
| *El Paso Field Office, ICE*; | § | |
| **TODD LYONS,** *Acting Director, ICE*; | § | |
| **MARKWAYNE MULLIN,**[1] *Secretary of* | § | |
| *Homeland Security*; and | § | |
| **FACILITY ADMINISTRATOR,** *ERO El* | § | |
| *Paso Camp East Montana*, | § | |
| | § | |
| ***Respondents*.** | § | |

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Sami Francis Khoury ("Petitioner") challenges his immigration detention while

the government facilitates his removal from the United States.[2]  Among other things, Petitioner

argues that the amount of time he's spent in detention—coupled with uncertainty regarding when

---

[1] The Senate confirmed Markwayne Mullin as Former Secretary Kristi Noem's successor on March 23, 2026, and he was sworn in on March 24, 2026.  The Court has therefore substituted Secretary Mullin in Former Secretary Noem's place as a named Respondent.  *See* FED. R. CIV. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . resigns[] or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.  Later proceedings should be in the substituted party's name . . . .  The court may order substitution at any time . . . .").

[2] *See generally* Pet., ECF No. 1.

(or whether) he'll be removed from the country—requires his release.[3]  Respondents, on the other hand, insist that Petitioner's continued detention is lawful.[4]

For the following reasons, the Court **GRANTS** the Petition **IN PART** and **ORDERS** Respondents to release Petitioner from custody.

## I.    INTRODUCTION

Petitioner first entered the United States in 1989 to attend the University of Texas at El Paso ("UTEP") on an F-1 student visa.[5]  After earning his degree in 1992, he remained in the country, started a family, and settled down in El Paso as a small business owner.[6]

In 1998, Petitioner was arrested for conspiring to bring in and harbor aliens under 8 U.S.C. § 1324(a).[7]  He pleaded guilty to that offense, which earned him a twenty-four-month prison sentence and rendered him removable under Section 1227(a)(2) of the Immigration and

---

[3] *See* Pet. at 23–26; *see generally* Pet'r's Reply, ECF No. 4.

All page citations in this Order refer to the page numbers assigned by the Court's CM/ECF system, rather than the cited document's internal pagination.

[4] *See generally* Resp'ts' Resp., ECF No. 3; Resp'ts' Status Update, ECF No. 6.

[5] *See* Pet. at 8; F-1 Visa Stamps, ECF No. 1-1, at 9.

[6] Pet. at 2, 8.

[7] *Id.* at 9; 1st Vasquez, Jr. Decl., ECF No. 3-1, at 2.

While the declaration located at ECF No. 3-1 was attributed to Martin A. Sarellano Jr., Carlos Vasquez, Jr. authored and signed the document.  *See* Resp'ts' Suppl. Br., ECF No. 11, at 1 ("[T]he previous declaration signed by Carlos Vasquez inadvertently stated an incorrect name in the title.").

Nationality Act (the "INA").[8]  The government initiated removal proceedings and ordered

Petitioner removed to Liberia, where he was born.[9]

Petitioner's removal order became final on May 23, 2001.[10]  By then, he had served his

prison sentence, and the Immigration and Naturalization Service ("INS")—the predecessor of

Immigration and Customs Enforcement ("ICE")—took custody over him.[11]  INS, however,

wasn't able to remove Petitioner[12]—although Petitioner was born in Liberia, there is conflicting

---

[8] *See id.*; Criminal Judgment, ECF No. 1-1, at 19–22; 1st Vasquez, Jr. Decl. at 2.

*See also* 8 U.S.C. § 1227(a)(2)(A)(i) (providing, in relevant part, that "[a]ny alien who . . . is convicted of a crime for which a sentence of one year or longer may be imposed" is removable).

Throughout this Order, the Court's references to "Sections" refer to sections of the INA, 8 U.S.C. §§ 1101 *et seq*.

[9] Pet. at 8; Stip. Order of Removal, ECF No. 1-1, at 4.

[10] *See* Pet. at 24; Resp'ts' Resp. at 2; *see also* Immigration Court Order re Mot. Reopen, ECF No. 1-1, at 6–7.

For the purposes of this Order, where the Court references to the date on which a removal order becomes "final," it means the date on which an alien's removal period begins.  *See* 8 U.S.C. § 1231(a)(1)(B) (specifying when "[t]he removal period begins").

[11] *See* Form I-213, ECF No. 10-1, at 12 ("On 01/12/2001 U.S. Marshalls [sic] transferred custody of Khoury, Sami Frances to INS El Paso . . . ."); 2d Vasquez, Jr. Decl., ECF No. 11-1, at 2 ("On or about January 12, 2001, Khoury was transferred into custody of the former Immigration and Naturalization Service in El Paso and served with Form I-862 . . . .").

[12] Marin Decl., ECF No. 6-1, at 2 ("[R]emovals to Lebanon and/or alternative third countries were not viable at the time.").

evidence regarding his citizenship.[13]  Thus, after failing to identify a country willing to accept him, INS released Petitioner from custody in August 2001 under an order of supervision.[14]

Over two decades later, on October 27, 2025, ICE revoked Petitioner's order of supervision and re-detained him under INA Section 1231(a)(6) to execute his removal.[15]  The government's efforts to remove Petitioner, however, have again proven unsuccessful.[16]

In total, Petitioner has been detained for roughly eight months since his removal order became final.  Yet, beyond Respondents' assurances that they're trying, there's no indication that Petitioner's removal is more imminent now than it was at any point in the past twenty-five years.

Petitioner now seeks a writ of habeas corpus, arguing that these circumstances require his release.[17]  The Court agrees.

---

[13] *See* Pet. at 2, 9.

*See also id.* at 1; Dec. 29, 1998 Request for Issuance of Final Order of Removal, ECF No. 1-1, at 24 ("I hereby admit that I am a citizen of Liberia . . . ."); Jan. 12, 1999 Request for Issuance of Final Order of Removal, ECF No. 1-1, at 27 ("I hereby admit that I am a citizen of Lebanon . . . .").

[14] Pet. at 9–10; 2d Vasquez, Jr. Decl. at 2.

[15] *See* Pet. at 11; Resp'ts' Resp. at 6; Marin Decl. at 2 ("On October 27, 2025, Khoury was apprehended by [ICE's Enforcement and Removal Operations ("ERO") division] in order to execute the final order of removal.").

[16] *See* 1st Vasquez, Jr. Decl. at 2 (noting that "the country of Liberia does not recognize Khoury as a citizen or national"); *id.* at 3 ("On or about December 8, 2025, [the Department of Homeland Security] sent [a] travel document packet, to include photos to the to the Consulate General of Lebanon"); 2d Vasquez, Jr. Decl. at 3 (noting that, as of March 23, 2026, the government was still awaiting a response from the Lebanese consulate).

[17] Although Petitioner argues that several different legal theories require his release, Pet. at 20–31, this Order focuses on whether his continued detention exceeds the government's authority under 8 U.S.C. § 1231(a)(6).  Because the Court will grant the Petition on that basis, *see generally infra*, it need not address Petitioner's other theories.  *See Fleming v. Collins*, 917 F.2d 850, 852 (5th Cir. 1990) ("Because we grant habeas corpus [relief] . . . on the first ground, we need not reach the other claims [petitioner] raises.").

## II.      LEGAL STANDARD

28 U.S.C. § 2241 allows alien detainees to challenge their detention as unlawful by filing a petition for a writ of habeas corpus.[18]  To obtain their release, aliens must show—by a preponderance of the evidence[19]—that they are "in custody in violation of the Constitution or laws or treaties of the United States."[20]

## III.     DISCUSSION

### A.      Governing authorities

#### 1.      Section 1231(a)

Section 1231(a) governs detention of aliens who are ordered removed from the country.[21] Once a removal order becomes final, Section 1231(a)(1) provides the government ninety days to secure removal.  This is known as the "removal period," during which detention is mandatory under the statute's plain text.[22]

As this case illustrates, though, not all aliens are removed during the removal period. Once the ninety-day removal period expires, Section 1231(a)(6) authorizes the government to continue detaining certain aliens, including those who (like Petitioner) are removable under

---

[18] 28 U.S.C. § 2241(c); *see also Zadvydas*, 533 U.S. at 699 (citing 28 U.S.C. § 2241(c)(3)).

[19] *Villanueva v. Tate*, No. CV H-25-3364, 2025 WL 2774610, at *4 (S.D. Tex. Sept. 26, 2025) (first quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011); and then citing *Bruce v. Estelle*, 536 F.2d 1051, 1058 (5th Cir. 1976)).

[20] 28 U.S.C. § 2241(c).

[21] *Zadvydas*, 533 U.S. at 682.

[22] *See* 8 U.S.C. § 1231(a)(2)(A) ("During the removal period, the Attorney General ***shall*** detain the alien." (emphasis added)); *see also Zadvydas*, 533 U.S. at 683 (2001) ("After entry of a final removal order and during the 90–day removal period, however, aliens must be held in custody . . . .").

Section 1227(a)(2).[23]  Notably, Section 1231(a)(6) doesn't expressly limit how long the

government may detain the specified classes of aliens:

> An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, ***may be detained beyond the removal period*** and, if released, shall be subject to . . . terms of supervision . . . .[24]

### 2.    *Zadvydas v. Davis*

That doesn't mean that the government's Section 1231(a)(6) detention authority is

unlimited, though.  In *Zadvydas v. Davis*, the Supreme Court considered whether Section

1231(a)(6) vests the government with unfettered discretion over whether and how long to

continue detention.[25]  There, the government continued detaining two aliens past the removal

period based on the criminal histories that precipitated their removal orders.[26]  The government,

however, hadn't been able to find a country willing to accept either of them, which resulted in

their prolonged detentions without a foreseeable end in sight.[27]

Although the Supreme Court acknowledged that Section 1231(a)(6) doesn't expressly

limit the duration of detention, it nonetheless construed the statute to contain implicit limits.[28]

---

[23] *See infra* note 24 and accompanying text.

[24] *See* 8 U.S.C. § 1231(a)(6) (emphasis added).

[25] *Zadvydas*, 533 U.S. 678.

[26] *See id.* at 684–86.

[27] *See id.*

[28] *See id.* at 682.

*Cf. Miller v. French*, 530 U.S. 327, 336 (2000) ("[W]here Congress has made its intent clear, 'we must give effect to that intent.'" (quoting *Sinclair Refin. Co. v. Atkinson,* 370 U.S. 195, 215 (1962))).

Specifically, the Supreme Court "detected ambiguity in the statutory phrase 'may be detained,'" concluding that "while 'may' suggests discretion, it does not necessarily mean unlimited discretion."[29]  The Supreme Court further reasoned that "if Congress had meant to authorize long-term detention of unremovable aliens, it certainly could have spoken in clearer terms."[30]

Having determined that Section 1231(a)(6) is ambiguous, the Supreme Court weighed competing interpretations of Section 1231(a)(6)'s detention authority.  The government's interpretation would have authorized indefinite detention[31]—which, according to the Supreme Court, would raise a "serious constitutional problem."[32]  As the Supreme Court had previously explained, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[33]  Applied to Section 1231(a)(6):

(1)    the statute's "basic purpose" is to "assur[e] the alien's presence at the moment of removal"; and

(2)    if it's unlikely that the Government will be able to remove an alien within the foreseeable future, detaining that alien under Section 1231(a)(6) wouldn't serve that purpose; so

---

[29] *Jennings v. Rodriguez*, 583 U.S. 281, 299 (2018) (citing *Zadvydas*, 533 U.S. at 697).

[30] *Zadvydas*, 533 U.S. at 697 ("[I]f Congress had meant to authorize long-term detention of unremovable aliens, it certainly could have spoken in clearer terms.").

[31] *Id.* at 692.

[32] *Id*. at 690.

*See also Jennings*, 583 U.S. at 296 ("When 'a serious doubt' is raised about the constitutionality of an Act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

[33] *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."); *see also Zadvydas*, 533 U.S. at 690 (citing *Jackson*, 406 U.S. at 738).

(3)     interpreting Section 1231(a)(6) to authorize the government to detain aliens whose removals aren't foreseeable would raise serious constitutional questions.[34]

To avoid those constitutional questions, the Supreme Court construed Section 1231(a)(6) to limit detention to a "reasonable time."[35]  As for what constitutes a "reasonable time," the Supreme Court determined that detention is "presumptively reasonable" for six months.[36]  "After th[at] 6–month period, "if the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must either rebut that showing or release the alien."[37]

### 3.     8 C.F.R. § 241.13

After *Zadvydas*, the INS incorporated the Supreme Court's guidance into 8 C.F.R. § 241.13.  That regulation (which now governs ICE's operations) recognizes that detention under Section 1231(a)(6) requires a "significant likelihood that the alien will be removed in the reasonably foreseeable future."[38]

Notably, 8 C.F.R. § 241.13 also places limits on *re*-detention.  Again incorporating *Zadvydas*'s foreseeability criteria, the regulation instructs that the government may "revoke an alien's release . . . and return the alien to custody if, on account of changed circumstances, the

---

[34] *Zadvydas*, 533 U.S. at 690 ("A statute permitting indefinite detention of an alien would raise a serious constitutional problem.").

[35] *Id.* at 689.

[36] *Id*. at 701.

[37] *Jennings*, 583 U.S. at 296 (citing *Zadvydas*, 533 U.S. at 701); *see also Zadvydas*, 533 U.S. at 699 ("Once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute.").

[38] *See generally* 8 C.F.R. § 241.13.

[government] determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future."[39]

### B.      Petitioner's continued detention isn't presumptively reasonable

In evaluating whether Section 1231(a)(6) authorizes Petitioner's continued detention, the Court must first assess whether his detention is presumptively reasonable.  That inquiry turns on how *Zadvydas*'s six-month "presumptively reasonable" period applies to aliens like Petitioner who were released and later re-detained.

### 1.      The six-month presumption's origins

To understand how the six-month presumption applies here, it's helpful to first consider how that presumption came to be.  Recall that Section 1231(a)(6) doesn't expressly limit the duration of detention.[40]  But by determining that the statute is ambiguous, the Supreme Court was able to read in a "reasonable time" limitation and "recognize [a] presumptively reasonable period of detention."[41]

For guidance on what that period should be, the Court consulted legislative history from the 1952 iteration of the INA.[42]  At that time, Congress was confronting how to "deal with the

---

[39] *Id.* § 241.13(i)(2); *see also Kong v. United States*, 62 F.4th 608, 619 (1st Cir. 2023) ("ICE's decision to re-detain a noncitizen . . . who has been granted supervised release is governed by ICE's own regulation requiring (1) an individualized determination (2) by ICE that, (3) based on changed circumstances, (4) removal has become significantly likely in the reasonably foreseeable future." (citing 8 C.F.R. § 241.13(i)(2))).

[40] *See supra* note 28 and accompanying text; *see also Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 757 (5th Cir. 2008) (noting that six months is "a period nowhere mentioned in the statute").

[41] *See Jennings*, 583 U.S. at 299.

[42] *Zadvydas*, 533 U.S. at 701 (citing Juris. Statement in *United States v. Witkovich,* O.T. 1956, No. 295, 8–9).  While the Supreme Court actually cited a jurisdictional statement (*i.e.*, the document in which an appellant explains the basis for the Supreme Court's jurisdiction), the cited portions of that jurisdictional statement summarize the 1952 INA's legislative history.

problem posed by the many aliens who had been ordered deported but remained in the United

States indefinitely because the countries of their nationality refused to receive them."[43]  The

House passed a bill (the "Hobbs Bill") that would have "provided power in the Attorney General

to indefinitely detain deportable aliens" who weren't removed within six months of a final

removal order.[44]  The Hobbs Bill, however, was met by resistance from the Senate Judiciary

Committee, which was concerned that allowing indefinite detainment past six months

"appear[ed] to present a constitutional question."[45]  Rather than confront that question, Congress

enacted the statute without the provisions authorizing the Attorney General to detain aliens

indefinitely.[46]

From this legislative history, the Supreme Court observed that "Congress previously

doubted the constitutionality of detention for more than six months."[47] And, on that basis, the

---

[43] *See* Juris. Statement in *United States v. Witkovich,* O.T. 1956, No. 295, 8.

*See also* S. Rep. 2239, 81st Cong., 2d Sess., 4 (1950) ("One of the most serious problems with which this country is faced is our inability to execute orders of deportation in certain cases.  If the country of the deportable alien's last residence, the country of his citizenship, or the country in which he was born refuses to accept the return of such deportable alien, there is nothing further that can be done under existing law.").

[44] *See* S. Rep. 2239, 81st Cong., 2d Sess., 8 (1950).

[45] *See id.*

[46] *See id.* ("The committee, without undertaking to pass on the constitutionality of this provision, has decided to delete the provision and to provide in its stead penal provisions to be invoked by judicial process against deportable aliens in the subversive, criminal, and immoral classes who fail to depart from the United States."); *see also* Amendments to Immigration Act of February 5, 1917, Pub. L. No. 82-414, ch. 5, 66 Stat. 163, 211 (1952).

[47] *Zadvydas*, 533 U.S. at 701.

Supreme Court recognized six months as the presumptively reasonable period for detention under Section 1231(a).[48]

### 2. The six-month presumption's application

*Zadvydas*'s holding, however, left open an important question—how should courts measure the presumptively reasonable six-month period where (as here) the government has not kept an alien in continuous, uninterrupted detention from the date of a final removal order? Petitioner argues that *Zadvydas*'s six-month period either (1) runs continuously from when a removal order becomes final;[49] or (2) aggregates current and prior detention times.[50] Respondents, on the other hand, argue that (3) the six-month presumption considers only current detention time.[51]  These three approaches yield different explanations for whether Petitioner's detention is still presumptively reasonable:

(1)     Petitioner's removal order became administratively final in May 2001.  Under Petitioner's first approach, *Zadvydas*'s six-month period would have ended in November 2001, meaning that his current detention was never presumptively reasonable.

(2)     Petitioner spent three months in detention in 2001 after his removal order became final.  Thus, under Petitioner's second approach, his current detention would have been presumptively reasonable for the first three months, but not thereafter; and

(3)     Petitioner's current detention has lasted less than six months.  Under Respondents' approach, his current detention is still presumptively reasonable.

---

[48] *Id.*

[49] Pet. at 3.

[50] *Id.* at 23–26.

[51] Resp'ts' Status Update at 1–2.

The Supreme Court didn't need to specify an approach in *Zadvydas*—the aliens there had been detained continuously since they were ordered removed, meaning that six months would have elapsed on the same date under any approach.[52]  And, in the absence of appellate guidance, district courts have split on how to apply *Zadvydas*'s six-month presumption to re-detention cases.[53]  Because *Zadvydas* dealt with continuous detention, this Court won't parse the holding as if it would reveal how the six-month presumption applies to aliens who have been released and re-detained.[54]  Rather, the Court finds it more appropriate to read the six-month presumption in the context of how and why the Supreme Court created it.[55]

---

[52] *See Zadvydas v. Underdown*, 185 F.3d 279, 283–84 (5th Cir. 1999); *Ma v. Reno*, 208 F.3d 815, 819–20 (9th Cir. 2000).  The Supreme Court consolidated these cases for argument and decided them together.  *Zadvydas*, 533 U.S. at 686.

[53] *See, e.g.*, *Farez-Espinoza v. Chertoff*, 600 F. Supp. 2d 488, 500 (S.D.N.Y. 2009) (determining that "the removal period, as well as any presumptively reasonabl[e] six-month period of removal to which the Government may have been entitled" had expired six months after the entry of the removal order); *Zavvar v. Scott*, No. CV 25-2104-TDC, 2025 WL 2592543, at *4 (D. Md. Sept. 8, 2025) ("[T]here is, at a minimum, a reasonable argument that the six-month period runs continuously from the beginning of the removal period, even if the noncitizen is not detained throughout that period.").

*See also, e.g.*, *Chen v. Holder*, No. 6:14-cv-2530, 2015 WL 13236635, at *2 (W.D. La. Nov. 20, 2015) (determining that prior and current detention should be aggregated for purposes of the six-month presumption); *Truong v. Bondi*, No. SA-25-CA-01947-XR, 2026 WL 475296, at *3 (W.D. Tex. Feb. 11, 2026) (same).

*See also, e.g.*, *Barrios v. Ripa*, No. 1:25-cv-22644, 2025 WL 2280485, at *8 (S.D. Fla. Aug. 8, 2025) (rejecting the argument that "detention should be counted in the aggregate based upon . . . prior detentions"); *Liu v. Carter*, No. 25-3036, 2025 WL 1207089, at *2 (D. Kan. Apr. 25, 2025) (same).

[54] *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023) ("The language of an opinion is not always to be parsed as though we were dealing with language of a statute.  Instead, we emphasize, our opinions dispose of discrete cases and controversies and they must be read with a careful eye to context." (citation modified)); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979) (explaining that "the language of an opinion is not always to be parsed as though [the Court] were dealing with language of a statute" and therefore reading a prior holding "on context").

[55] *See supra* note 54 and accompanying text.

As noted above, the Supreme Court recognized the presumption after observing that Congress had doubted "the constitutionality of detention for more than six months."[56] There's no indication, however, that Congress viewed six months (by itself) as a constitutional limit to detention. In fact, where the Senate Judiciary Committee expressed concerns about the Hobbs Bill's constitutionality, it didn't mention six months at all:

> The bill, as it passed the House of Representatives, provided power in the Attorney General ***to indefinitely detain*** deportable aliens in certain cases. This provision in the bill as it passed the House of Representatives appears to present a constitutional question.[57]

Indeed, the Senate Judiciary Committee's real concern was indefinite detention. The six-month mark bore on that concern because that was the period in which the government was ordinarily able to complete the removal process.[58] And, critically, where Congress discussed a six-month timeframe, it did so by reference to the passage of time since an alien's removal order—not detention time.[59] That distinction is borne out not only by the legislative history,[60] but also in the text that Congress ultimately passed:

---

[56] *See supra* note 47 and accompanying text.

[57] *See* S. Rep. 2239, 81st Cong., 2d Sess., 8 (1950) (emphasis added).

[58] *See id.* at 5 ("In the ordinary case the deportation of an alien from this country is usually accomplished well within 6 months after an order of deportation has been issued against him."); *accord* H. Rep. 1192, 81st. Cong., 1st Sess., 6 (1950).

*See also* S. Rep. 2239, 81st Cong., 2d Sess., 6 (1950) ("The committee considers that 6 months is a reasonable time to grant to our Government within which to conclude the necessary detail work involved in some cases before deportation of an alien can be effected.").

[59] *See, e.g., supra* note 58.

[60] It is permissible and appropriate to consult the legislative history here because the Supreme Court has already concluded that the relevant statutory provision is ambiguous. *Compare, e.g., 21st Mortg. Corp. v. Glenn (In re Glenn)*, 900 F.3d 187, 191 n.3 (5th Cir. 2018) ("[C]onsidering legislative history is permissible only if there is ambiguity."), *with Zadvydas*, 533 U.S. at 697 (concluding that "the word 'may'" in Section 1231(a)(6) "is ambiguous").

- 13 -

> When a final order of deportation under administrative processes is made against any alien, the Attorney General shall have a period of ***six months from the date of such order*** . . . within which to effect the alien's departure from the United States . . . .
>
> . . .
>
> Any alien, ***against whom a final order of deportation . . . has been outstanding for more than six months,*** shall, pending eventual deportation, be subject to supervision under regulations prescribed by the Attorney General.[61]

Given the Supreme Court's reliance on these materials as evidence of Section 1231(a)'s durational limits, whether detention is presumptively reasonable must depend on when the removal order becomes final—not how long an alien has spent in detention.[62]

That conclusion also squares with *Zadvydas*'s core principle that the nature and duration of detention must relate to the purpose for which someone is detained.[63]  As the Supreme Court explained, Section 1231's basic purpose is to "assur[e] the alien's presence at the moment of removal"—as limited to the "period reasonably necessary to secure removal."[64]  If—as Congress concluded—it ordinarily shouldn't take the government more than six months to remove an alien from the country,[65] then it makes sense to presume that detention for those six months both

---

[61] Amendments to Immigration Act of February 5, 1917, Pub. L. No. 82-414, ch. 5, 66 Stat. 163, 210–11 (1952) (emphases added).

[62] *Cf. Hammers v. IRS* (*In re Hammers*), 988 F.2d 32, 34 (5th Cir. 1993) ("The sole purpose of statutory construction including, when appropriate, a review of all available legislative history, is to ascertain the intent of the legislative authority.").

[63] *See Zadvydas*, 533 U.S. at 690 (citing *Jackson*, 406 U.S. at 738).

[64] *Id.* at 699.

[65] *See supra* note 58 and accompanying text.

(1) relates to the purpose of "assuring the alien's presence at the moment of removal" and (2) is limited to the "period reasonably necessary to secure removal."[66]

Conversely, it doesn't make sense to presume that an alien's detention is reasonable purely based on the amount of time they've spent in detention. This case illustrates that point. Nearly twenty-five years have passed since Petitioner's removal order became final.[67] At this point, there's a disconnect between Petitioner's circumstances and Congress's belief that the government should be able to secure removal within six months of a final removal order.[68] The Court can't discern any logic in taking a presumption grounded in those six months post-final removal order and applying it decades later. Yet, that's exactly what either detention-time-focused approach would have the Court do.[69]

The Court therefore concludes that *Zadvydas*'s six-month presumptively reasonable period runs continuously from the date on which an alien's removal order becomes final—irrespective of whether an alien spends all or some of that six-month period in detention. Because Petitioner's removal order became final on May 23, 2001, the presumptively reasonable

---

[66] *See Zadvydas*, 533 U.S. at 699.

[67] *See* Pet. at 24.

The Court notes that the government can still facilitate removal (for example, by requesting travel documents) while an alien periodically reports under an order of supervision. *See, e.g.*, Pet. at 9 (noting the government's efforts to facilitate Petitioner's removal while he was released under an order of supervision); *see also, e.g.*, *Abublakan v. Sec'y, Dep't of Homeland Sec.*, No. 2:26-CV-109-KCD-DNF, 2026 WL 607608, at *1 (M.D. Fla. Mar. 4, 2026) (noting the government's "efforts to obtain travel documents" from various countries while an alien was released under an order of supervision).

[68] *See supra* notes 58 and accompanying text.

[69] *See supra* notes 49–51 and accompanying text.

period for his detention expired on November 23, 2001.  Thus, his current detention nearly twenty-five years later isn't presumptively reasonable.

To be sure, this conclusion isn't a "Get Out of Jail Free Card" for Petitioner or other aliens who remain in the country for over six months after their removal orders become final.[70] To obtain their release, these aliens must still carry their burden of providing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."[71] As the Court will now explain, Petitioner has done just that.

### C.    Petitioner's removal is not significantly likely in the reasonably foreseeable future

Because Petitioner's detention isn't presumptively reasonable, the Court must consider whether Petitioner's removal is foreseeable.  Under *Zadvydas*, aliens typically bear the initial burden of providing good reason to believe that there ***isn't*** a significant likelihood of removal in the reasonably foreseeable future.[72]   Some courts, however, have concluded that where (as here) the government re-detains an alien after revoking their release, 8 C.F.R. § 241.13(i)(2) applies and requires ***Respondents*** to show that such a likelihood of removal ***does*** exist.[73]

The Court need not resolve which burden-shifting framework applies to *Zadvydas* claims involving re-detention—even if *Zadvydas*'s burden-shifting framework (*i.e.*, the framework that

---

[70] *Contra Meskini v. Att'y Gen. of United States*, No. 4:14-CV-42 (CDL), 2018 WL 1321576, at *3 (M.D. Ga. Mar. 14, 2018) ("This Court does not read *Zadvydas* to be a permanent 'Get Out of Jail Free Card' that may be redeemed at any time just because an alien was detained too long in the past.").

[71] *See Zadvydas*, 533 U.S. at 701.

[72] *See supra* note 37 and accompanying text.

[73] *See, e.g.*, *Escalante v. Noem*, No. 9:25-CV-00182-MJT, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025) ("[U]pon revocation of supervised release, it is the [government's] burden to show a significant likelihood that the alien may be removed."); *accord Yan-Ling X. v. Lyons*, 813 F. Supp. 3d 1157, 1164 (E.D. Cal. 2025).

is less favorable to Petitioner) applied, Petitioner's continued detention is unreasonable and no longer authorized under Section 1231(a).

### 1. Petitioner has provided good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future

Solely for the purposes of this Order, the Court will review the parties' arguments under *Zadvydas*'s burden-shifting framework—under which Petitioner must first provide good reason to believe that there isn't a significant likelihood of removal in the reasonably foreseeable future.[74]  While "'[g]ood reason' is not an onerous standard,"[75] it requires more than just "conclusory statements suggesting that he will not be immediately removed."[76]

Petitioner notes that his removal order became final in May 2001.[77]  Around that time, he signed documents to help facilitate his removal—first to Liberia, and then to Lebanon.[78]  Despite Petitioner's cooperation, neither country accepted him, and INS released him under an order of supervision.[79]

---

[74] *Zadvydas*, 533 U.S. at 701.

[75] *See Mogos v. Thompson*, No. 5:26-CV-0740-JKP, 2026 WL 475079, at *4 (W.D. Tex. Feb. 13, 2026).

[76] *Andrade v. Gonzales*, 459 F.3d 538, 543–44 (5th Cir. 2006).

[77] *See* Pet. at 24.

[78] *See* Dec. 29, 1998 Request for Issuance of Final Order of Removal at 24; Jan. 12, 1999 Request for Issuance of Final Order of Removal at 27.

[79] *See* Pet. at 9–10.

Petitioner also notes that the government continued its efforts to remove him after his release—namely, by requesting travel documents for his removal approximately three to five times over the course of two-plus decades.[80]  Again and again, those attempts failed.[81]

The government renewed its removal efforts after re-detaining Petitioner in October 2025.  On December 1, 2025, ERO submitted a travel document request to the Liberian Consulate.[82]  The Liberian Consulate again disclaimed him as a Liberian citizen and declined to accept him.[83]

Respondents then shifted their focus back to removing Petitioner to Lebanon.  On December 8, 2025 and February 2, 2026, ERO sent travel document requests to the Lebanese Consulate.[84]  And on March 5 and 23, 2026, ERO followed up with the Lebanese Consulate for updates.[85]  By all indications, Respondents still haven't received an answer.[86]

---

[80] *Id*. at 12.

[81] *Id.*

[82] 2d Vasquez, Jr. Decl. at 2–3.

[83] *Id.*; Pet'r's Reply at 1–2.

[84] *See* Marin Decl. at 2; 2d Vasquez, Jr. Decl. at 3.

[85] Marin Decl. at 3; 2d Vasquez, Jr. Decl. at 3.

[86] Marin Decl. at 3 (indicating that, as of March 12, 2026, ERO "ha[d] not received an answer yet" regarding its request for Lebanese travel documents); 2d Vasquez, Jr. Decl. at 3 (indicating that, as of March 23, 2026, ERO was "pending a response" regarding its request for Lebanese travel documents).

*See also Abkarian v. Warden*, No. 5:25-CV-03584-ODW (AGRX), 2026 WL 127941, at *3 (C.D. Cal. Jan. 12, 2026) (concluding that the government's "failed attempts to obtain [travel documents] from the [Lebanese] Consulate suggest that the Lebanese government may be unable or unwilling to provide identification or travel documents that are necessary to facilitate . . . removal").

As Petitioner points out, his removal process is in virtually the same place as it was nearly twenty-five years ago.[87]  These circumstances provide good reason to doubt that Petitioner's removal is significantly likely in the reasonably foreseeable future.[88]

### 2.   Respondents have failed to rebut Petitioner's showing

Respondents, by contrast, haven't offered anything to suggest that Petitioner's removal is more foreseeable now than it's been at any point since the government ordered him removed.  As far as the record reflects, Liberia and Lebanon are the only countries to which Respondents have attempted to remove Petitioner.  Yet, Petitioner's disputed citizenship has frustrated those removal efforts for decades.[89]

Though Respondents still seem intent on removing Petitioner to Lebanon, nothing in the record suggests that his disputed citizenship is any less of a problem now than it was before.[90] Four months after Respondents contacted the Lebanese Consulate—and roughly twenty-five years after they first attempted to remove Petitioner to Lebanon—all Respondents have to show for their efforts are unanswered requests for travel documents.[91]  Those requests don't satisfy

---

[87] Pet'r's Reply at 4.

[88] *See, e.g.*, *Mogos*, 2026 WL 475079, at *5 (finding that a petitioner's removal wasn't reasonably foreseeable where there was "no stated progress on such removal during the [p]etitioner's continued detention"); *Nguyen v. Scott*, 796 F. Supp. 3d 703, 722–23 (W.D. Wash. 2025) (determining that a petitioner carried his burden where "the process for procuring travel documents . . . continue[d] to be uncertain and protracted").

[89] *See, e.g.*, *supra* notes 13–14 and accompanying text.

[90] *See Hoac v. Becerra*, No. 2:25-CV-01740-DC-JDP, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025) (finding no significant likelihood of removal in the reasonably foreseeable future where "Respondents [had] not provided any details about why a travel document could not be obtained in the past, nor . . . attempted to show why obtaining a travel document [was] more likely this time around").

[91] *See, e.g.*, *supra* note 86 and accompanying text.

Respondents' "burden to furnish evidence demonstrating that removal is likely in the reasonably foreseeable future."[92]

Despite having detained Petitioner for a total of roughly eight months since his removal order became final, Respondents haven't made any meaningful progress towards removal. Respondents themselves even concede that they "cannot provide the Court an exact date of when removal to Lebanon will occur."[93]  At this stage, it remains uncertain whether Petitioner's removal to Lebanon is even possible—let alone significantly likely in the reasonably foreseeable future.  And while not necessarily fatal to Respondents' removal efforts, the recent escalation of violence in Lebanon doesn't make Petitioner's removal any more foreseeable either.[94]

Section 1231(a) doesn't authorize Respondents to detain Petitioner indefinitely while they pursue a removal that may never happen.[95]  Under these circumstances, Petitioner's continued detention is unreasonable and no longer authorized by statute.[96]

---

[92] *See Trejo v. Warden of ERO El Paso E. Montana*, 807 F. Supp. 3d 697, 706 (W.D. Tex. 2025) (collecting cases supporting the conclusion that "the Government's burden to furnish evidence demonstrating that removal is likely in the reasonably foreseeable future is not met by a pending request for travel documents, alone").

[93] Resp'ts' Status Update at 2.

[94] *See, e.g.*, U.S. Dep't of State, Lebanon Travel Advisory (last modified Feb. 23, 2026), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/lebanon-travel-advisory.html [https://perma.cc/ZDG3-2HUU] ("Do Not Travel to Lebanon due to **crime, terrorism, civil unrest, kidnapping, unexploded landmines, and the risk of armed conflict**."); *see also Alain Ata v. Strafford Cnty. Dep't of Corr., Superintendent*, No. 1:26-CV-6-PB-TSM, 2026 WL 914957, at *5 (D.N.H. Apr. 3, 2026) ("ICE attests that it has successfully removed between ten and forty aliens to Lebanon annually since 2019, although only three aliens thus far in 2026.").

[95] *See Zadvydas*, 533 U.S. at 689.

[96] *Id.* at 699–700 ("[I]f removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute.").

### D.      Scope of Relief

Because Petitioner's continued detention is no longer authorized, the Court will order his release.[97]  *Zadvydas* counsels that "the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances."[98]  The record here indicates that (1) Petitioner spent over two decades under various conditions of supervision; and (2) he complied with those conditions through his re-detainment in October 2025.[99]  The Court therefore directs Respondents to release Petitioner under a form of supervised release that accounts for his history of compliance.

Respondents may continue to facilitate removal while Petitioner is released under supervision.  However, Respondents may only re-detain Petitioner if (1) Petitioner violates his conditions of release;[100] or (2) on account of changed circumstances, there is a significant likelihood that Petitioner may be removed in the reasonably foreseeable future.[101]

Finally, Petitioner seeks attorney's fees and costs under the Equal Access to Justice Act (the "EAJA").[102]  The EAJA does not authorize attorneys' fees or costs in habeas proceedings

---

[97] *See id.* (contemplating an alien's release where detention is no longer authorized); *see also supra* note 37 and accompanying text.

[98] *Zadvydas*, 533 U.S. at 700.

[99] *See* Pet. at 10; *see also* 2d Vasquez, Jr. Decl. at 2 ("Khoury was released from custody on . . . August 31, 2001, on an order of supervision (OSUP).  Khoury has been reporting on a regular basis.").

[100] *See Zadvydas*, 533 U.S. at 700; *see also* 8 C.F.R. § 241.13(i)(1) ("Violation of conditions of release.").

[101] *See Zadvydas*, 533 U.S. at 701; *see also* 8 C.F.R. § 241.13(i)(2) ("Revocation for removal.").

[102] Pet. at 31.

like this one.[103]  Seeing no other appropriate basis to grant this relief, the Court denies

Petitioner's request for attorney's fees and costs.[104]

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Petitioner Sami Francis Khoury has shown

by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws

or treaties of the United States."[105]

The Court therefore **GRANTS** Petitioner Sami Francis Khoury's Petition for Writ of

Habeas Corpus under 28 U.S.C. § 2241 (ECF No. 1) **IN PART**.

The Court **ORDERS** Respondents to **RELEASE** Petitioner from immigration detention

**UNDER SUPERVISION on or before April 24, 2026**.

The Court **FURTHER ORDERS** that Respondents shall notify the Court of Petitioner's

release **by 5:00 PM Mountain Time on April 27, 2026**.

The Court **FURTHER ORDERS** that Respondents may only re-detain Petitioner if:

(1)    Petitioner violates his conditions of release; or

(2)    based on new developments in Respondents' efforts to remove
       Petitioner, there is a significant likelihood that Petitioner may be
       removed in the reasonably foreseeable future.

The Court **FURTHER ORDERS** that Petitioner's request for attorney's fees and costs is

**DENIED**.

---

[103] *See Barco v. Witte*, 65 F.4th 782, 785 (5th Cir. 2023).

[104] *Oliver v. Arnold*, 3 F.4th 152, 163 (5th Cir. 2021) ("We, of course, follow the 'American Rule' under which '[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise.'" (citing cases)).

[105] *See supra* notes 19–20 and accompanying text.

- 23 -

The Court **FURTHER ORDERS** that Secretary of Homeland Security Markwayne Mullin be **SUBSTITUTED** in Former Secretary of Homeland Security Kristi Noem's place as a respondent in these proceedings. The Court **DIRECTS** the Clerk of Court to adjust the caption accordingly.

Finally, now that Petitioner has obtained the habeas relief to which he is entitled, there appears to be nothing further for the Court to do in this case. The Court therefore **CLOSES** the above-captioned case.

**So ORDERED and SIGNED this 21st day of April 2026.**

_____
**DAVID C. GUADERRAMA**
**SENIOR U.S. DISTRICT JUDGE**